

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 19, 2024

Via ECF
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

>   **Re:**    ***United States v. Álvaro Fredy Córdoba Ruíz*, S1 22 Cr. 121 (LJL)**

Dear Judge Liman:

    The Government respectfully submits this letter in advance of defendant Álvaro Fredy Córdoba Ruíz's April 26, 2024 sentencing and in response to the defendant's April 12, 2024 sentencing submission. (Dkt. 77 (the "Def. Mem.")). The defendant conspired to source and distribute tons of cocaine destined for the United States. With his co-defendants, Amanda Libia Palacio Mena ("Palacio") and Alberto Alonso Jaramillo Ramirez ("Jaramillo"), and other individuals associated with the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), the defendant worked with individuals he believed to be narcotics traffickers from a Mexico-based drug trafficking organization (the "Mexican DTO") seeking to establish a cocaine supply line from Venezuela to the United States. These individuals, however, were actually confidential sources ("CS-1," CS-2," and "CS-3," respectively, and the "CSes" collectively) who were working at the direction of the Drug Enforcement Administration (the "DEA"). In conversations with the CSes, the defendant described his connections to his sister, a powerful politician in Colombia named Piedad Córdoba ("Piedad Córdoba"), indicating that, in exchange for financial and political support, she would help to facilitate a cocaine partnership between the defendants and the Mexican DTO. The defendant also promised to connect the CSes with individuals who could provide large quantities of cocaine and security for the promised cocaine loads. Soon after meeting the CSes, the defendant delivered on both fronts—he introduced the CSes to Piedad Córdoba and to Jaramillo, a former police officer who had worked for Colombia's anti-narcotics police directorate and could assist the defendants in their cocaine trafficking. Together, the defendants then obtained a five-kilogram sample of high-quality cocaine for the Mexican DTO, with promises of many tons to follow—the partnership aspired to transport 500 kilograms of cocaine on as much as a weekly basis.

    In February 2022, Colombian law enforcement authorities arrested the defendant, and in January 2023, he was extradited from Colombia to the United States. On January 2, 2024, he pled guilty to conspiring to import cocaine, pursuant to a plea agreement (the "Plea Agreement") in which the parties stipulated that the applicable sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 210 to 262 months' imprisonment. The

defendant now seeks a dramatic downward variance from the bottom of that range, and argues instead that the mandatory minimum sentence of five years' imprisonment is appropriate in this case. None of the factors he cites, standing alone or taken together, would justify a variance of this magnitude. Indeed, the defendant seeks the sentence that he would receive for conspiring to import *500 grams* of cocaine to the United States—a fraction of the quantity that he sought to actually import to this country, and just ten percent of the five-kilogram sample that the defendants actually produced. The defendant set up what he and his co-defendants intended to be a lucrative cocaine partnership that they hoped would ship tons of poison to this country. After Palacio introduced him to the CSes, the defendant effectively put the deal together—he brought in Jaramillo, who had direct access to the FARC's cocaine and to military and law enforcement who would protect the cocaine loads, and the defendant also introduced Piedad Córdoba, to use her high-level political connections to facilitate their partnership. This conspiracy was not mere bluster—far from it. The defendants actually delivered, as they provided a five-kilogram sample of very pure cocaine as evidence of their capabilities. In the face of this serious conduct, the defendant fails to present a compelling justification that would warrant such a large variance, let alone a justification for the mandatory minimum sentence. The Government thus respectfully submits that a sentence within the stipulated Guidelines range of 210 to 262 months' imprisonment would be sufficient but no greater than necessary in this case.

## FACTUAL BACKGROUND

I.      **Offense Conduct**

        A.  **Overview**

        The defendants planned to transport cocaine from Venezuela to Colombia, through Central America and Mexico, to its ultimate intended destination, the United States. (March 27, 2024 Final Presentence Investigation Report ("PSR") ¶ 10). Members of the conspiracy worked to accomplish this goal in over three hundred recorded calls and meetings that took place over more than a year.[1] (PSR ¶ 10). Throughout, the defendants believed that they were helping the CSes, on behalf of the Mexican DTO, establish a new cocaine supply line out of Venezuela and Colombia. (PSR ¶ 10).

        At the outset of the investigation, Palacio told the CSes that she was available as a broker for large cocaine transactions with expansive connections to, among others, the FARC, the Cartel of the Suns, and Colombian political leaders.[2] (PSR ¶ 11). Palacio introduced the CSes to the

---

[1] Many of these conversations occurred in Spanish. The descriptions of statements described herein are based on preliminary translations and draft summaries of recordings, which were produced to the defense.

[2] For decades, the FARC operated cocaine fields and laboratories in Colombia and Venezuela, was responsible for the production and distribution of the majority of the cocaine that eventually reached the United States, and was dedicated to the violent overthrow of the Colombian government.

In March 2020, current and former high-ranking members of the Venezuelan government and the FARC were charged in this District with participating in a narco-terrorism conspiracy. *See United States v. Maduro Moros, et al.*, S2 11 Cr. 205 (AKH). As alleged in that case, leaders of the Cartel

defendant, who had political and logistics connections in Colombia. And the defendant, in turn, introduced Jaramillo, who agreed to provide security for drug loads as well as connections to sources of supply. (PSR ¶ 11). In December 2021, to prove their bona fides and establish the quality of their supply, the defendants sold the CSes a five-kilogram sample of cocaine. (PSR ¶ 12). The defendants were arrested in Colombia in February 2022, in the midst of negotiating much larger cocaine purchases (PSR ¶ 12), of 500 kilograms each, which would be the first of additional loads in an ongoing partnership involving as much as *weekly* shipments.

**B. Initial Discussions Between Palacio and the CSes Regarding a Cocaine Partnership and a Potential Weapons Deal**

This investigation began in approximately March 2020, when Palacio began discussing with CS-3 that she could provide new routes and sources of supply for CS-3's associates in the Mexican DTO.[3] (PSR ¶ 13). As these discussions continued, Palacio met other individuals who purported to be members of the Mexican DTO (but who were also, in reality, acting at the behest of the DEA). Palacio introduced CSes to potential partners for their planned cocaine venture as well as for a possible weapons deal. Palacio and the CSes continued these discussions in recorded calls and in WhatsApp chats over the ensuing months.

For example, on a recorded phone call on September 10, 2020, CS-3 introduced Palacio to CS-1—who was purporting to be CS-3's boss in the Mexican DTO—so they could discuss establishing a cocaine supply line from Colombia and Venezuela. (PSR ¶ 14). And, on November 2, 2020, CS-3 and CS-2—who was purporting to be CS-1's lieutenant in the Mexican DTO—met Palacio at a restaurant in Medellín, Colombia. (PSR ¶ 15). During the meeting, which was audio- and video-recorded, CS-2 told Palacio that the cocaine would be sent to CS-2's clients in New York and elsewhere in the United States. (PSR ¶ 15). Palacio also described how her "aunt"—who Palacio stated was Piedad Córdoba, who was then serving as a senator in Colombia, and who passed away in January 2024—had received "320,000" in exchange for a favor she did for the FARC and former Venezuelan President Hugo Chávez. (PSR ¶ 15). Palacio also described prior narcotics transactions and multiple of her narcotics contacts. (PSR ¶ 15).

As another example, on February 25, 2021, at a restaurant in Bogotá, Colombia, Palacio introduced CS-3 and CS-2 to a chemist named "Martin" who described his control of numerous cocaine processing laboratories in Colombia. (PSR ¶ 16). During the meeting, which was audio- and video-recorded, Palacio, "Martin," CS-3, and CS-2 discussed, for example, pricing and other details for a potential cocaine partnership; two policemen who had recently been assassinated and the price for hitmen; and how cocaine is "cut" with different substances, with Palacio stating that some people mix cocaine with sheetrock. (PSR ¶ 16). "Martin" also showed CS-2 a photo of a

---

of the Suns—a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who abused their positions and corrupted the legitimate institutions of Venezuela, including parts of the military, intelligence apparatus, legislature, and judiciary—facilitated the importation of tons of cocaine into the United States in part through partnership with the FARC.

[3] At various points, the investigation was slowed because of the pandemic, including through quarantine requirements and travel restrictions.

dead person who had been shot in the head and indicated that the victim was a member of a rival organization. (PSR ¶ 16).

### C. Palacio Introduces the Defendant, and the Defendant Introduces Jaramillo, to Facilitate a Large Cocaine Partnership with the Mexican DTO

#### i. The Defendant Joins the Narcotics Importation Conspiracy

On July 16, 2021, on a recorded phone call, Palacio introduced the defendant to the CSes, describing the defendant as someone who had high-level contacts in the Colombian government. (PSR ¶ 17). Prior to the defendant joining the call, Palacio told CS-2 that the defendant could answer questions about the "lady"—a reference to Piedad Córdoba—and that the defendant would be able to help with whatever they wished to accomplish. (PSR ¶ 17). Palacio stated that she had already told the defendant that CS-2 was interested in supporting Piedad Córdoba financially and with votes in upcoming elections, and that the Mexican DTO would provide financial and political support to Piedad Córdoba in exchange for her assistance in facilitating a cocaine partnership. (PSR ¶ 17). After Palacio passed the defendant the phone, the defendant asked CS-2 in which sector of the economy CS-2 and his associates worked. (PSR ¶ 17). CS-2 responded that they worked in farming and import-export; CS-2 also noted he wanted to speak in-person because there were things with which they could help each other, but that CS-2 did not like to speak on the phone. (PSR ¶ 17). The defendant stated that he understood and would talk to Palacio about it. (PSR ¶ 17). The defendant further said that he is the "go-to" person; that everything with respect to Piedad Córdoba has to go through him; that they would need to speak in-person; and that politically this may be a win-win for everyone involved.

On July 21, 2021, Palacio advised CS-2, by WhatsApp message, that "la sra Piedad," meaning "the Mrs. Piedad," would be contacting him by phone. (PSR ¶ 18). That same day, the defendant and Palacio contacted CS-2 by videoconference, which CS-2 recorded. (PSR ¶ 18). At the beginning of the call, Palacio said, "patch the lady through," followed by an unidentified female voice asking if the person speaking was CS-2, identifying CS-2 by a name used by CS-2 during the investigation. (PSR ¶ 18). During the call, CS-2 told the defendant and Palacio that CS-2 and his associates were seeking help to work in Colombia on a large scale; that CS-2 made payments to the Mexican government in exchange for its protection; that CS-2 did not belong to a particular Mexican "cartel" but instead paid "plazas" in Mexico (a term for a cartel's geographic footprint) to be able to do CS-2's work; and that CS-2 was looking for a "padrino" or godfather who could protect him in Colombia. (PSR ¶ 18). The defendant responded that he would talk to Palacio about it; that based on what CS-2 had said, the defendant knew what CS-2 was looking for; and that, if the defendant found a contact with those characteristics, he would help CS-2 through Palacio. (PSR ¶ 18). At the end of the call, Palacio mentioned that they could talk to the "lady." (PSR ¶ 18).

The following day, on July 22, 2021, on a recorded call between CS-2 and Palacio, Palacio stated that Piedad Córdoba had listened in on at least part of the July 21 call and was hesitant to discuss drug trafficking over the phone because she is a "public figure." (PSR ¶ 19). Palacio also stated that the defendant and Piedad Córdoba have government connections in Colombia, Venezuela, and Cuba, and that the defendant receives instructions from "the lady." (PSR ¶ 19).

On August 10, 2021, CS-2 met with the defendant and Palacio in Medellín. (PSR ¶ 20). Prior to the defendant's arrival, CS-2 said he was glad that Palacio had already told the defendant that they were going to start moving "kilos of cocaine over there." (PSR ¶ 20). After the defendant arrived, the defendant and Palacio confirmed that they understood CS-2 was looking for people who could provide safe transport for the cocaine without interference from law enforcement. (PSR ¶ 20). When CS-2 said that the business is not "clean," the defendant responded that this was the main reason why they must have the chance to discuss things clearly. (PSR ¶ 20). In addition, during the conversation, CS-2 and the defendant went into detail about their expectations for their cocaine partnership. At the outset, CS-2 stated that he does not want there to be a misunderstanding, and the defendant agreed, noting they needed to go into their partnership carefully and securely.

Next, the defendant asked CS-2 for more details about the proposed partnership. The defendant stated that he did not have the connections that CS-2 needed, but said that he would start checking on them; that if the defendant were able to firm something up, CS-2 could pay the defendant (in other words, that there was no need to pay in advance); and that even though the defendant was not an expert in the field, he had friends who knew the field very well and would introduce CS-2 to someone with high-quality merchandise (meaning, cocaine). (PSR ¶ 20). When CS-2 mentioned that "Martin" (the chemist discussed earlier) wanted money in advance of their cocaine transaction, the defendant commented that this was a trick because "that is never paid in advance." (PSR ¶ 20). In addition, the defendant mentioned that he has a friend who has been in "this field" for a long time, knows military officials, and had recently visited and requested the defendant's help with a job. (PSR ¶ 20). The defendant also discussed his connections in the political world and said that he runs his sister's political campaign and they recently had a meeting. Ultimately, the defendant offered to see if he could find a source of supply and security—in particular, finding someone who could supply them "that" or someone who can at least bring them close to people who could. Palacio also described how CS-2 could buy votes for Piedad Córdoba. (PSR ¶ 20)

During the meeting, when CS-2 described how someone had already offered to move cocaine for the group, the defendant asked if CS-2 planned to place "them" "there," and CS-2 confirmed they are planning to place "it" in Colombia. The defendant further asked if the people who offered to move the cocaine are from Medellín, and Palacio responded they were not. The defendant stated that it is essential for them to get involved with the Congress and the members of the House of Representatives from Antioquia, Colombia, to ensure security for cocaine loads. The defendant confirmed that he would soon be attending a meeting and could ask people there about security (for cocaine loads).

### ii.  The Defendant Introduces Jaramillo and His Associates

On August 13, 2021, during a recorded videoconference between the defendant, Palacio, and CS-2, the defendant delivered on one of his promises and introduced CS-2 to his contact, who went by "Hector," later identified as Jaramillo. (PSR ¶ 21). Prior to Jaramillo joining the videoconference, CS-2 asked the defendant whether Jaramillo worked in security or with the suppliers, and the defendant responded that he would be involved in both aspects of their partnership. (PSR ¶ 21). After Jaramillo joined the videoconference, Jaramillo said he had worked for the Colombian government for many years and had worked with the defendant for many years;

when CS-2 specifically asked whether Jaramillo had done "this type of work" with the defendant before, Jaramillo confirmed that he and the defendant had worked together before and that Jaramillo knows about the "two things" that they need to organize the partnership well—*i.e.*, security and a source of supply. (PSR ¶ 21). Jaramillo further stated he considers this business to be a serious matter and something they can continue to do for a long time.

On August 27, 2021, the defendants and CS-2 participated in a recorded videoconference in which Jaramillo reported that they already had a very good amount of "chickens"; that they already had the people to assist with the cocaine partnership; and that they were only waiting for CS-2 to tell them when, how, and where before they could start squaring everything away. (PSR ¶ 21). The defendant suggested another in-person meeting in Colombia to further discuss their narcotics partnership. (PSR ¶ 22).

On September 3, 2021, as the defendant suggested, the group met in-person in Medellín. The defendants, two individuals identified as "Antonio," a/k/a "Toño," and "Jorge Mario," CS-2, and CS-1 (CS-2's purported boss) then discussed detailed plans for the cocaine partnership. (PSR ¶ 23). During the meeting, which was audio-recoded and partially video-recorded, the defendants again demonstrated their deep familiarity with large-scale cocaine trafficking and commitment to the partnership. (PSR ¶ 23). Jaramillo described himself as a former police officer who had worked for Colombia's anti-narcotics police directorate. (PSR ¶ 23). Jaramillo stated that his sources of supply could produce up to 8,000 kilograms every four months and could provide a sample of up to five kilograms of cocaine for testing to ensure its purity was sufficiently high. (PSR ¶ 23). Jaramillo also offered to bring the CSes to the cocaine laboratory. (PSR ¶ 23). Jaramillo introduced CS-1 and CS-2 to Antonio, whom he described as an immigration supervisor, in case they needed any help with cocaine loads at the airport. (PSR ¶ 23). Jaramillo also introduced them to Jorge Mario and discussed ways to move up to $1,000,000 in narcotics proceeds. (PSR ¶ 23). Jaramillo described logistics for using aircraft to transport cocaine to Mexico, including the types of planes that sources of supply were using, including "G," a reference to Gulfstream models. (PSR ¶ 23).

Palacio stated that she understood that the sources of supply would be willing to split the cost of investing in a 1,000-kilogram load of cocaine, and to transport 500 kilograms at a time. (PSR ¶ 23). The defendant asked whether the money is to buy "five hundred" and CS-2 responded that the plan is for that amount. (PSR ¶ 23). The group, including the defendant, raised glasses of beer to toast this plan. Jaramillo suggested that they transport the 500-kilogram loads weekly. Jaramillo and Palacio discussed transporting cocaine through Mexico, and then by vehicle into the United States. (PSR ¶ 23). Palacio stated that she knew that money would be returned to Colombia via airplane. Jaramillo noted that his "people" were members of "Los Soles," a reference to the Cartel of the Suns. (PSR ¶ 23). Jaramillo also noted that he and the defendant call each other by their first names in order to evade law enforcement's attention. (PSR ¶ 23).

During the meeting, the defendant acknowledged that he and Jaramillo had already conducted several "errands" together and that he trusted Jaramillo. The defendant noted that while he had previously mentioned to CS-2 that there were other people that he could ask for help with the drug transaction, the defendant wanted to be absolutely sure that the person he was going to be dealing with was discreet. The defendant stated he and Jaramillo are known as individuals who are very discreet with information. (PSR ¶ 23). The defendant further stated that some individuals involved in this business "cannot keep their mouth shut," and he was not interested in dealing with

The Honorable Lewis J. Liman                                                                                          Page 7
April 19, 2024

those types of people. The defendant explained why he was telling CS-2 this background, underscoring that he wanted CS-2 to know that he was dealing with very responsible individuals. The defendant then said that he agreed to meet with CS-2 because Palacio is like a sister to him. At one point, when CS-2 asked the defendant about pricing, the defendant replied, "it is not much since it is only 40,000," which the group later confirmed was the price for a several-kilogram sample. At another point during the meeting, the defendant also stated that he has been in the political arena with his sister for the past thirty years.

Toward the end of the meeting, the defendant called Piedad Córdoba, who called back a short time later. (PSR ¶ 23). The defendant then handed the phone to CS-1, and Piedad Córdoba invited CS-1 to an upcoming political convention in Bogotá. At the end of the meeting, the defendant told CS-2 that the defendant believed his sister's phone was being intercepted by law enforcement, so they only speak about specific things on the phone together.

### iii. The Defendants Attend a Political Event at Piedad Córdoba's Invitation

On September 23, 2021, the defendant, Palacio, and CS-2 (as CS-1's representative) attended the political event in Bogotá. (PSR ¶ 24). During the conference, Palacio spoke with Piedad Córdoba, reminding Piedad Córdoba that she had spoken to CS-1 (CS-2's purported boss) by phone the week prior. (PSR ¶ 24). A photo showing the defendant, Palacio, Piedad Córdoba, and CS-2 (whose face is redacted, along with other individuals) is shown below.



### D. The Defendants Finalize the Sale of a Five-Kilogram Cocaine Sample

In order to finalize their lucrative cocaine partnership, the defendants next obtained a five-kilogram sample of high-quality cocaine for the CSes. On a recorded phone call on December 13, 2021, with the defendant, Palacio, CS-1, and CS-2, Córdoba encouraged CS-1 and CS-2 to travel to Colombia to obtain the five-kilogram sample of cocaine. (PSR ¶ 25). The defendant also said he would tell his contact that they needed "five" for a "technical review," a reference to testing the purity of a five-kilogram cocaine sample. (PSR ¶ 24). Palacio stated that she would call CS-2 when the cocaine was ready so that CS-2 could meet her in Colombia. (PSR ¶ 25).

On December 15, 2021, the defendant and CS-2 participated in a recorded phone call during which CS-2 asked if the five-kilogram sample was ready. (PSR ¶ 26). The defendant responded that it was ready for pick-up in Medellín. (PSR ¶ 26).

On December 17, 2021, the defendants and CS-2 met at an apartment in Medellín to discuss the five-kilogram sample and, during this meeting, the defendant confirmed and underscored his connections to and knowledge of the FARC and the FARC's cocaine trafficking. (PSR ¶ 27). During the meeting, Jaramillo stated that they had spoken directly with the "people in the south," a reference to the FARC, and that the FARC had everything, including the routes, the trucks, and whatever they needed in Mexico, whether that was 1,000 or 2,000 kilograms of cocaine. (PSR ¶ 27). Jaramillo also stated that the FARC could receive narcotics proceeds in Mexico. (PSR ¶ 27). Jaramillo confirmed that he was in contact with a FARC commander, and that he and the commander had discussed whether the commander could provide access to landing strips for aircraft. (PSR ¶ 27). Certain of the defendant's statements during this meeting are described below:

- The defendant said that the FARC camp where the FARC commander was located had "at least 300 men" and was "armed to the teeth." (PSR ¶ 27). The defendant also stated that the FARC's money is derived from "the coca, the labs, the landing strips, and the airplanes," and "everything is fully secured".

- Additionally, the defendant explained where the FARC camp was located and offered to arrange for CS-2 to travel there and meet with the FARC commander to discuss quantity, pricing, and logistics. (PSR ¶ 27). Specifically, the defendant stated that they will need to take a trip to Popoyan, Colombia, which is run by the FARC; the FARC will pick them up there; they will then travel an hour-and-a-half away from the FARC camp; CS-2 will have around five minutes to meet with the FARC commander and explain their objectives, including the planes, the departures, the landing strips and the amount of cocaine they want; and the FARC commander will provide the prices.

- The defendant noted that they would have to travel to Popoyan because FARC members are suspicious, as there are a lot of people involved with "the DEA and the police." (PSR ¶ 27).

- The defendant also stated that the CSes need Piedad Córdoba's friendship and to tell her they are very good friends of the defendant and would like her help.

Subsequently, the defendants and CS-2 traveled to a local church, where they met an individual named "Gabriel," who Jaramillo described as having connections to a nearby farm that was storing cocaine and could provide the five-kilogram sample. (PSR ¶ 28). The defendant, Palacio, Gabriel, and CS-2, then traveled to a farm outside of Medellín. Gabriel and CS-2 left the defendant and Palacio a short distance from the farm. (PSR ¶ 29). Armed men were stationed at the entrance of the farm. (PSR ¶ 29). At the farm, an unidentified male arrived and gave CS-2 approximately five kilograms of a substance that later tested positive for cocaine, with purity of between 86.6% to 89.1%. The five kilograms are depicted below:



(PSR ¶ 29).

The defendant, Palacio, and CS-2 then returned to Medellín, where they met with an undercover officer ("UC") working with the Colombia National Police ("CNP"), who was posing as an associate of CS-2. (PSR ¶ 30). The UC gave a bag of approximately $15,000 in U.S. currency to CS-2. (PSR ¶ 30). CS-2 then took the money out of the bag and counted it with the defendant and Palacio. (PSR ¶ 30). The five kilograms of cocaine was then transferred into the bag. (PSR ¶ 30).

### E.  The Defendants Finalize a Cocaine Partnership and Are Arrested

After the successful five-kilogram sample, the defendants focused on finalizing the next step in their partnership, a large cocaine shipment bound for the United States. (PSR ¶ 31). On February 2, 2022, the defendants and CS-2 met in Medellín. (PSR ¶ 31). At the meeting, Jaramillo—who was alone on a balcony with CS-2 at this point—arranged for CS-2 to meet an individual described as "Commander Martin" at a FARC camp to discuss an initial shipment of 500 or 1000 kilograms; to "check the production," *i.e.*, the coca fields, and to discuss which "brand," *i.e.*, stamp, would be placed on the cocaine. (PSR ¶ 31). Jaramillo stated that "Commander Martin," a commander for the Southern Block of the FARC, would be wearing a rifle on his back and a uniform. (PSR ¶ 31). Jaramillo stated that he expected that "Commander Martin" could get the shipment out in four or five days, and that "Commander Martin" has cocaine laboratories, airstrips, and vehicles at his command. Palacio connected CS-2 by phone with her contact from the United Arab Emirates, who Palacio indicated would be able to assist with security in any country in the world and commands private planes and helicopters, both armed and unarmed. (PSR ¶ 31). Palacio also told CS-2 that there may be an opportunity to launder money. (PSR ¶ 31). Jaramillo also told CS-2 that Jaramillo had met with Piedad Córdoba, and that the defendant "loves money" and has had problems with Piedad Córdoba because the defendant has gotten her in trouble before. Jaramillo also stated that he had told "Commander Martin" that they were coming and were going to help "her" (*i.e.*, Piedad Córdoba). At the end of the meeting, CNP officers arrested the defendants. (PSR ¶ 31).

The Honorable Lewis J. Liman                                                    Page 10
April 19, 2024

**II.     Procedural History, Sentencing Guidelines, Probation's Recommendation and the Defendant's Position**

The defendants were first charged by a criminal Complaint, filed on January 26, 2022, charging the defendants with (1) conspiring to (a) import into the United States five kilograms or more of cocaine, (b) manufacture and distribute cocaine, intending and knowing that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, and (c) manufacture and distribute cocaine on board an aircraft registered in the United States, in violation of Title 21, United States Code, Sections 952, 959, 960, and 963; (2) using and carrying machineguns and destructive devices during and in relation to, and in furtherance of, the offense charged in Count One, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii); and (3) conspiring to use and carry machineguns and destructive devices during and in relation to, and in furtherance of, the offense charged in Count One, in violation of Title 18, United States Code, Section 924(o). (Dkt. 43-1).

On February 24, 2022, a grand jury in this District returned an Indictment charging the defendants with the same counts charged in the Complaint. (Dkt. 2). On February 28, 2023, a grand jury in this District returned the S1 Indictment, charging the defendants with only Count One.[4] (Dkt. 12).

On January 19, 2023, the defendant was extradited from Colombia to the United States.[5] (PSR ¶ 32). On January 20, 2023, the defendant was presented before Magistrate Judge Barbara C. Moses, and consented to detention, and he has remained remanded. (Dkt. 9).

On January 2, 2024, the defendant pled guilty, pursuant to the Plea Agreement, to the lesser-included charge of conspiring to import 500 grams and more of cocaine, in violation of 21 U.S.C. § 963. (PSR ¶ 4). Pursuant to the Plea Agreement, and as also calculated by the Probation Office, the applicable offense level is 37, the applicable Criminal History Category is I, and the stipulated Guidelines range is 210 to 262 months' imprisonment. (PSR ¶¶ 5, 38-51, at 33).

The Probation Office assessed that the defendant "engaged in a serious offense where he played a role in attempting to facilitate a large-scale cocaine partnership, and he was well aware that her actions were illegal" and "is being held responsible for conspiring with others to import 450 kilograms or more of cocaine, and for a firearm being possessed during the offense, which demonstrates his lack of regard for the laws of this country or the criminal justice system." (PSR at 34). The Probation Office recommends a variance to a sentence of 120 months' imprisonment,

---

[4] As in many other recent cases, the Colombian Supreme Court approved the extraditions of the defendants only on Count One, based on extraterritoriality requirements under Colombian law.

[5] Palacio and Jaramillo were extradited to the United States and arrived in the Southern District of New York from Colombia on April 14, 2023 and March 22, 2024, respectively. (PSR ¶ 32). Palacio pled guilty to the lesser-included charge of conspiring to import 500 grams and more of cocaine, in violation of 21 U.S.C. § 963, and on April 11, 2024, the Court imposed a sentence of 168 months' imprisonment. Jaramillo's case is pending.

after accounting for the defendant's "physical health" and lack of criminal history. (PSR at 34). The defendant seeks a sentence that is half of the Probation Office's below-Guidelines recommendation, arguing that the mandatory minimum sentence of five years' imprisonment is appropriate. The defendant points to various factors, including that he has not been arrested before, his good character, and employment history; that the investigation was a "sting" and his role in the offense; his age and health; the conditions of his incarceration; and purported sentencing disparities. (*see, e.g.*, Def. Mem. 1-4).

## **DISCUSSION**

> III.     **The Court Should Impose a Sentence Within the Stipulated Guidelines Range of 210 to 262 Months' Imprisonment**
>
> > A.     **The Nature and Circumstances of the Offense, the History and Characteristics of the Defendant, and Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment Support a Sentence Within the Stipulated Guidelines Range**

The nature and circumstances of the defendant's conduct, the defendant's history and characteristics, the seriousness of the offense, and the need to promote respect for the law and provide just punishment merit a sentence within the stipulated Guidelines range. 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). For over six months, the defendant worked toward brokering a conspiracy to join the FARC and a purported Mexican DTO, in order to distribute an enormous amount of cocaine to communities in the United States. The defendant, with his co-defendants and other co-conspirators, sought to distribute 500 kilograms of cocaine sourced from the FARC on as much as a *weekly* basis. The quantity of cocaine the members of the conspiracy sought to distribute *every single week* exceeded the 450 kilograms needed to trigger the highest offense level under the Guidelines. And 450 kilograms of cocaine is itself a staggering number. In fiscal year 2022, only 7.6 percent of 19,575 cases involving drug trafficking and the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38.[6] Every dose of cocaine that the defendant planned to distribute is deserving of punishment, and a ton of cocaine provides for thousands of individual doses and lives impacted. "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Pelagio Suarez*, 16 Cr. 453 (RJS) (Dkt. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). In his effort to partner with the Mexican DTO, the defendant endeavored to participate "in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24). And this sort of cocaine trafficking harms every country the drugs transit:

---

[6] These statistics are taken from reports prepared by the United States Sentencing Commission, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2022/Ch2_Guideline_FY22.pdf

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other countries, the safety of people in those countries, in the strength of their institutions, including their judicial institutions, including their police and prosecutorial forces. This drug activity contributes to all of that. It is organized crime. When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries. It is a serious crime.

*United States v. Cabezas Garcia*, 17 Cr. 23 (RJS) (Dkt. No. 71, Tr. 21).

The defendant was indispensable to this large-scale narcotics importation conspiracy. It was the defendant who provided connections to the Colombian political apparatus, without which a cocaine supply line of this magnitude would not be successful. As the defendant explained, he was the go-to person; everything regarding Piedad Córdoba had to go through him and he ran her political campaign; and the partnership could be a win-win for everyone involved—cocaine for the Mexican DTO, and financial support for the defendants and Piedad Córdoba. (*See*, *supra*, p. 4). The defendant also suggested working with political leaders in Antioquia to ensure the security for cocaine loads, and he offered to speak with people at an upcoming meeting to that effect. (*See*, *supra*, p. 5). The defendant's willingness to facilitate the corruption of legitimate institutions in Colombia to assist with the importation of tons of cocaine militates in favor of a sentence within the stipulated Guidelines range.

It was also the defendant who provided the connections to tons of cocaine and to security for that cocaine, through his introduction of Jaramillo to the CSes. Jaramillo, a former police officer from Colombia' anti-narcotics unit who had connections to the Cartel of the Suns and others, was exactly the person they needed to effectuate the deal. (*See*, *supra*, p. 6). This was not a new contact—the defendant said that he and Jaramillo had conducted several "errands" together, and Jaramillo also confirmed that he had done "this type of work" with the defendant before and they had worked together for many years. (*See*, *supra*, p. 6). Thus, the defendant's access to these types of connections, for cocaine supply and for help in securing the valuable cocaine loads, also speak to the need for a sentence within the stipulated Guidelines range. Relatedly, the defendant's argument that the defendant was less culpable simply because he did not enter the farm where they obtained five kilograms of cocaine (Def. Mem. at 3) is contradicted by the essential role that the defendant did in fact play in the narcotics scheme, as described above, as well as his knowledge that the farm was full of heavily-armed FARC members who would source his cocaine.

The defendant's actions and statements during the conspiracy also underscore his deep familiarity with the narcotics importation world. For example, the defendant opined that a narcotics supplier should not be requesting money in advance. (*See*, *supra*, p. 5). He stated that a proposed price for a cocaine sample "is not much since it is only 40,000." (*See*, *supra*, p. 7). The defendant also knew details about the FARC members they were working with—he told the CSes that the camp where the FARC commander holding the cocaine was located had "at least 30 men" and was "armed to the teeth," and he also described in detail the camp's location and a planned trip to meet a FARC commander near Popoyan, Colombia. (*See*, *supra*, p. 8). In that same regard, the defendant demonstrated concern for investigation by law enforcement and knowledge and practice of how to avoid detection in narcotics dealings—Jaramillo explained that he and the defendant purposefully referred to each other in communications by only their first names, making it harder for law enforcement to identify them; the defendant emphasized his and Jaramillo's discretion in narcotics

dealings, noting that some individuals in this business cannot keep their mouths shut; and the defendant expressed concern that his sister's phone was being monitored by law enforcement. (*See*, *supra*, pp. 6-7). Relatedly, the defendant explained that the FARC members they were working with were suspicious because of "the DEA and the police," showing that he was not only understood the gravity of his criminal actions, but also that they ran the risk of scrutiny from law enforcement. (*See*, *supra*, pp. 7-8).

The defendant attempts to portray Palacio as more culpable since she, among other things, introduced the CSes to various narcotics contacts, was involved in the conspiracy for a longer period of time, and, he argues, it was only she who "boasted about Piedad Cordoba." (Def. Mem. at 25-34). On balance, however, the Government, views the defendant as being more culpable than Palacio, for several reasons: The defendant was in a position to, and attempted to, corrupt Colombian political institutions through the narcotrafficking trade. Moreover, although Palacio introduced the CSes to more narcotrafficking contacts than Córdoba did, it was Córdoba's connections to Jaramillo that led to sourcing the cocaine from the FARC and introductions to individuals who would handle logistics and security, which concretized the deal. Palacio's longer participation in the scheme was in part due to the quarantines and attendant travel restrictions from the COVID-19 pandemic. The short period of time it took for Córdoba to introduce Jaramillo—just one month after the defendant himself joined the conspiracy—speaks to the defendant's real connections in the narcotrafficking arena and his ability to quickly turn words into action. Finally, contrary to the defendant's claim, he did in fact advertise his connections to Piedad Córdoba—as noted above, the defendant described himself as the go-to person, stated everything regarding Piedad Córdoba had to go through him, noted that he ran her political campaign, and said the partnership could be a win-win. (*See*, *supra*, p. 4). The defendant's statements and actions—relating to his connections to political heavy-hitters, sources of supply, and security, as well as his actions betraying familiarity with international cocaine deals—call out for a sentence within the Guidelines range.

The history and characteristics of the defendant also speak to the need for a sentence of within the stipulated Guidelines range. *See* 18 U.S.C. § 3553(a)(2)(A). The defendant attempted to broker a large cocaine partnership with individuals associated with the FARC and those he thought to be members of the Mexican DTO. The defendant argues that, because he was not previously arrested in Colombia, and "[n]othing in his past suggests that he was in any way a narcotics trafficker," he should receive a 60-month sentence. (Def. Mem. at 1). However the defendant has admitted on recordings, as detailed above, that he has detailed knowledge of the FARC, including specifics about narcotics prices and FARC camps, as well as a history of cocaine trafficking with Jaramillo. Accordingly, his lack of criminal history evidences only that he has been well-connected and cautious enough to not have been caught before. This is aggravating, not mitigating, given his own statements in this case.

In addition, the defendant benefitted from higher education, having obtained undergraduate and graduate degrees and a graduate certificate, and has been consistently employed, including as a public official in Colombia. (PSR ¶¶ 77-92; *see also* Def. Mem. 7-9). Thus, the defendant appears to have had the opportunity to live a law-abiding life, one with financial stability, fulfilling work, and family support—far from the drug trade's violence, corruption and ruin that has plagued Colombia for decades. He instead chose to work with his co-defendants and others to attempt to source cocaine from such destabilizing forces within his own country and to distribute massive

amounts of it to the United States. That he did so despite having 20 to 25 years of public service experience in Colombia and assisting Piedad Córdoba's political campaign speaks to a profound disrespect for the law.

The defendant makes several other arguments in contending that a downward variance to the mandatory minimum sentence of 60 months' imprisonment is warranted. As explained below, these arguments lack merit.

*First*, the defendant argues that "this was a 'sting' case" where Piedad Córdoba was "the ultimate target," and that the defendant, "who was never a drug trafficker before," "failed" a "moral test" in order to "feel important and play a role helping his famous sister's campaign." (Def. Mem. at 2-3, 14-15). But the undisputed facts do not support these claims. To begin with, it was Palacio—not the DEA or DEA sources—who introduced the defendant to the conspiracy. Then, once he was introduced to the conspiracy, the defendant, with his co-conspirators, provided five kilograms of cocaine, illustrating their ability and intent to engage in this conduct on the scale reflected in their negotiations with the CSes. And any argument that the defendant failed a simple, discrete "moral test" is not supported by the recordings, which reveal the defendant's repeated desire to build out a massive cocaine partnership and his apparent knowledge of and connections in the drug trade.

The defendant's reference to an out-of-Circuit case, *United States v. McLean*, 199 F. Supp 3d 926, 943 (E.D. Pa. 2016), regarding that court's concerns about a "sting" operation involving a stash house is unavailing. (Def. Mem. 14-15). There, the court criticized an investigation in which a defendant was targeted using a "sting" technique "because of a professed willingness to rob a drug stash house that was invented entirely by Government agents, containing a fictional amount of drugs chosen by those agents," which had the effect of triggering a mandatory-minimum sentence. *McLean*, 199 F. Supp. 3d at 928. Here, in contrast, while the Mexican DTO was not real, the defendant and his co-conspirators provided five kilograms of *very* real cocaine from the FARC, and discussions about the thousands of kilograms of cocaine that the defendants planned to distribute were driven by the defendants and corroborated by their access to cocaine laboratories and FARC-controlled areas. (*See, e.g.*, PSR ¶ 23 (Jaramillo stating that his suppliers could produce up to 8,000 kilograms every four months); PSR ¶ 23 (Palacio describing splitting the cost of investing in a 1,000-kilogram load of cocaine with the suppliers and transporting 500 kilograms at a time)). The defendant also cites the Government's comments at a recent sentencing regarding the types of questions courts may ask in "sting" cases, which, at bottom, concern the target's significance. (Def. Mem. at 15). By that metric, the defendant was significant, based on the evidence cited above—including the defendant's important role in connecting Jaramillo and Piedad Córdoba to the conspiracy, the defendant's apparent familiarity with the narcotics world, and the defendant's and Jaramillo's statements that they had worked together on narcotics deals previously. In sum, the defendant's arguments concerning the fact that this was a sting operation do not merit the leniency he now seeks. The DEA appropriately identified the defendants owing to their access to cocaine, corrupt political connections, and desire to move *massive* quantities of poison to this community. The defendants validated this strategic investigation by distributing five kilograms of cocaine to the CSes as they hoped to transport thousands of kilograms more. The defendant and his co-conspirators proved they were ready, willing, and more than capable of engaging in massive cocaine trafficking, just as they explained they had done in the past. This is why the defendant's arguments on this score fall flat.

*Second*, the defendant argues that his physical health warrants a variance. (Def. Mem. at 9-10, 17, 22-23). The defendant, who is 65 years old, describes pain in his upper jaw and shoulders due to loss of bone density and an old sports injury; various other pains, one of which he described in the PSR as "occasional" (PSR ¶ 66); and taking medication to manage certain conditions (Def. Mem. at 9-10). While the Government acknowledges the defendant's health issues, it bears putting them in perspective. First, the defendant's reported medical problems are not severe—indeed, they appear far less severe than those of many other inmates, particularly inmates who are around 65 years old. Second, BOP has medical facilities that are capable of caring for these injuries as well as for far more severe problems if they arise. And, finally, if the defendant does not feel like he is receiving adequate medical care, he has the ability to seek Court intervention. Nothing about the defendant's health is particularly unusual such that it supports as significant a variance as that sought by the defendant.

*Third*, the defendant points to his conditions of confinement while he has been detained pretrial, including in Colombia, the MDC, and Westchester. (Def. Mem. at 21-23). To the extent that the defendant's argument rests on lockdowns and quarantines resulting from the COVID-19 pandemic, while BOP facilities have assuredly had challenges, including lockdowns, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020); *see also United States v. Mateo*, 299 F. Supp. 2d 201, 208 (S.D.N.Y. 2004) (courts typically grant variances or departures only where "the conditions in question [were] extreme to an exceptional degree and their severity [fell] upon the defendant in some highly unusual or disproportionate manner."). The Court, of course, may consider the conditions of incarceration in determining the defendant's sentence, but the dramatic variance the defendant seeks on that basis is wholly inappropriate when measured against the severity of his conduct, as well as the other 3553(a) factors. *See United States v. Woodberry*, 2023 WL 3573759, at *2 (2d Cir. May 22, 2023) (sentence within District Court's discretion when it "declined to vary further" than "a modest downward variance" in light of custodial conditions during pandemic "because it determined that the mitigating factors in [defendant's] favor were offset by several aggravating factors").

### B. A Sentence Within the Stipulated Guidelines Range is Necessary to Afford Adequate Deterrence and Protect the Public

A sentence within the stipulated Guidelines range is also necessary to adequately deter conduct like that of the defendant and to protect the public. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). Specific deterrence, in particular, is a serious consideration. The defendant is 65 years old and in relatively good health. Once released from prison and returned to Colombia—the location from which he committed the charged offense—the defendant could again draw upon his contacts within the Colombian political establishment and narcotrafficking world to resume brokering drug deals. A substantial incarceratory sentence is necessary to send a message to the defendant that he should not return to criminal conduct upon his release.

General deterrence is also important. This case has received significant press coverage in Colombia. The defendant's guilty plea was covered extensively by the media in Colombia and in

Spanish-language publications, and his sentence will surely receive further coverage.[7] The drug trade in Colombia continues, with tons of cocaine pouring into the United States each year. Cocaine trafficking of this scale is difficult to disrupt. It is important that where individuals, who engage in international narcotics trafficking—whether through a "sting" technique or otherwise—are caught, the sentences that they receive send a clear message that this conduct will not be tolerated. This, too, counsels in factor of a sentence within the stipulated Guidelines range.

## C. A Sentence Within the Stipulated Guidelines Range Would Not Result in Unwarranted Sentencing Disparities

Nor would a sentence within the stipulated Guidelines range result in unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). The defendant cites several cases in arguing for a 60-month sentence, each of which is distinguishable. (Def. Mem. at 12-13, 34-36). In *United States v. Castro*, 21 Cr. 287 (AT) (S.D.N.Y.), a narcotrafficker sent multiple shipments of cocaine by airplane, approximately 151 kilograms of which were seized, and instructed drug mules to swallow condoms with cocaine, and received a 96-month sentence. Here, in contrast, the defendant conspired to import many thousands of kilograms to the United States and was directly involved in a major Colombian politician's political campaigns. In *United States v. Lopez Flores*, 15 Cr. 174 (LGS) (S.D.N.Y.), a former Honduran police officer participated in two meetings in which he and others agreed to provide security for a 200- or 300-kilogram cocaine load to pass through Honduran law enforcement checkpoints, and received a 60-month sentence. Unlike the defendant, Lopez Flores was not captured on audio recordings boasting of his prior participation in narcotics trafficking or connections to the FARC, and did not participate in the eventual sale and deliver of a five-kilogram sample of cocaine. *United States v. Rosario Carrasquillo*, 21 Cr. 173 (LJL) (S.D.N.Y.), concerned eight kilograms of methamphetamine, different than this case, which involved establishing a new supply route for tons of cocaine to be distributed to the United States. Finally, in (i) *United States v. Ramirez Rodriguez*, S14 19 Cr. 91 (DLC) (S.D.N.Y.), the defendant coordinated the handoff of a ten-kilogram sample of cocaine and discussed details of larger shipments, but was viewed as less culpable than his co-defendants. (Dkt. 310, Sentencing Tr. 10), and (ii) *United States v. Djeme*, 12 Cr. 972, a defendant conspired to import hundreds of kilograms of cocaine into the United States, but was also viewed as less culpable than his co-defendants. In contrast to the defendants in *Ramirez Rodriguez* and *Djeme*, this defendant was more culpable than Palacio for the reasons described above.

The defendant's request for a sentence of 60 months' imprisonment is inconsistent with other narcotics importation cases of this magnitude and utterly fails to account for the gravity of the defendant's crime. *See, e.g.*, *United States v. Tapia*, 22 Cr. 532 (GHW) (imposing 162-month sentence where defendant, a native of Ecuador, provided confidential sources with a twelve-kilogram sample of cocaine in furtherance of up to 1,000-kilogram deal that later involved attempted purchase of firearms and explosives); *United States v. Fabio Porfirio Lobo*, 15 Cr. 174 (LGS), Dkt. 250 (imposing 288-month sentence on son of former president of Honduras for

---

[7] *See, e.g.*, L. Neumeister and J. Goodman, "Brother of Powerful Colombian Senator Pleads Guilty in New York to Narcotics Smuggling Charge," A.P. News (Jan. 2, 2024), https://apnews.com/article/alvaro-cordoba-plea-colombia-drugs-new-york-25beaf9129ead34a31a88f1124c562a8.

brokering corrupt connections between large-scale Honduran traffickers and government officials, including congressmen and customs, military and law enforcement personnel). *See also United States v. Gorgeech*, 21 Cr. 559 (SHS), Dkt. 68 (imposing 240-month sentence where defendant a native of Pakistan, provided confidential sources with a seven-kilogram sample of heroin from his laboratory in Afghanistan, assured the confidential source that he could arrange for 1,000 kilograms of heroin, and then received payment of $35,000 for the seven-kilogram heroin sample); *United States v. Balouchzehi*, 21 Cr. 658 (JMF), Dkt. 110 (imposing 240-month sentence where defendant, a native of Iran, arranged for a courier in Mozambique to provide a two-kilogram sample of heroin for delivery to the United States, later described during in-person meetings in Kenya with an undercover agent and confidential source how he was a leader in a drug trafficking organization that had distributed drugs around the globe for years, and discussed providing 500-kilogram loads and as much as two or three tons that year); *United States v. Campo Flores & Flores de Freitas*, S2 15 Cr. 765 (PAC), Dkt. 191-92 (imposing 216-month sentences upon two nephews of Venezuela's first lady, who devised a plan to work with the FARC members to import over 800 kilograms of cocaine from Venezuela to the United States); *United States v. Khan*, 16 Cr. 840 (LGS) (imposing 180-month sentence where 71-year-old defendant, a native of Pakistan, agreed to transport tens of thousands of kilograms of heroin to New York City and provided a five-kilogram sample of heroin); *United States v. Younes and Gomez*, 18 Cr. 262 (VEC) (imposing 120-month sentences where 74- and 76-year-old defendants, natives of Colombia, brokered and provided a five-kilogram sample of cocaine and conspired to transport many tons more).

While these comparators may serve as benchmarks, after considering the unique facts of this case, a Guidelines sentence would not result in unwarranted sentencing disparities. For the reasons set forth above, including the defendant's attempts to use his political and law enforcement connections to distribute an enormous amount of the FARC's cocaine to the United States for a purported Mexican DTO, the defendant's deep knowledge of and connections to the FARC, and the defendant's own admissions concerning his history of cocaine trafficking, a Guidelines sentence would be appropriate in this case.

The Honorable Lewis J. Liman                                                                        Page 18
April 19, 2024

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to a sentence within the stipulated Guidelines range of 210 to 262 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/
Nicholas S. Bradley /
Kaylan E. Lasky /
Kevin T. Sullivan /
Assistant United States Attorneys
(212) 637-1581 / 2315 / 1587

Cc:    Defense Counsel
(Via ECF)